## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Paul Quast,                                    Civil Action No.: _____

      Plaintiff,

v.

Medical Device Business Services, Inc.,
an Indiana Corporation (f/k/a DePuy
Orthopaedics, Inc.),

      Defendant.

## COMPLAINT AND JURY DEMAND

Paul Quast (hereinafter "Plaintiff" or "Mr. Quast"), through his attorneys, DeWitt LLP, hereby submits the following Complaint and Jury Demand against Medical Device Business Services, Inc., formerly known as DePuy Orthopaedics, Inc. ("MDBS" or "DePuy") and states as follows:

### THE PARTIES & JURISDICTION

1.      At all times relevant to this action, Plaintiff Quast was and is a resident of the State of Minnesota.

2.      At all times relevant to this action, DePuy was a corporation organized and existing under the laws of the State of Indiana, with its headquarters and principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana, 46581, which is in Kosciusko County and duly licensed and authorized to conduct business within the state of Minnesota.

3.      In March 2017, DePuy changed its entity name to Medical Device Business Services, Inc.  DePuy, now MDBS, was the responsible manufacturer of the product at issue in this case.

4.      At all relevant times, Defendant DePuy regularly conducted business in Minnesota.

5.      Defendant was involved in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the DePuy ATTUNE Knee System, as well as monitoring and reporting adverse events.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Defendant is incorporated and has its principal places of business in states other than the state in which Plaintiff resides.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in this District, and because Defendant conducted regular business in this District.

8.      This is a personal injury action arising out of Defendant's ATTUNE total knee replacement system.

## **GENERAL ALLEGATIONS**

9.      The knee is the largest join in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur), and the kneecap (patella).  The knee joint is lined with cartilage to protect the bones from rubbing against each other.  This ensures that the joint surfaces can glide easily over one another.  The human knee is a complicated joint which supports the entire body weight on four surfaces through a variety of motions essential to everyday life.

10.    People who suffer pain and disability from injury or damage to the knee joint may elect to have a knee replacement.  Knee replacement technology can provide a solution to the pain and restore basic function.

11.    Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), is a commonly performed orthopedic procedure.  The surgery is designed to help relieve pain, to improve joint function, and to replace bones, cartilage, and/or tissue that have been severely injured and/or worn down generally in people with severe knee degeneration due to arthritis, other disease, or trauma.

12.    In a total knee replacement surgery, physicians resurface the bone at the top of the shin (tibia) with a metal tray topped with a medical-grade plastic spacer, called a bearing.  This plastic replaces the cartilage, providing a cushioning surface for the new knee.  The bottom of the thigh (femur) bone is resurfaced with a rounded metal part.  This piece is designed to mimic the curve of the natural bone.  These components can be fixed to the bone by either using bone cement or a press fit, allowing the bone to grow into the coating on the implant.

13.    DePuy, founded in 1895, purports to be a worldwide leader in the design and manufacture of orthopedic devices and products, including knee replacement products and devices.

## HISTORY OF THE ATTUNE SYSTEM AND ATTUNE S+ SYSTEM

14.    Defendant introduced the DePuy Synthes P.F.C. SIGMA System ("SIGMA system") in 1996.

15.    Following the introduction of the SIGMA system, the Defendant altered the SIGMA system design in an effort to replicate the total flexion of the natural knee and maintain a competitive position in the market.  This new project resulted in the DePuy Attune TM Knee System, ("ATTUNE system").

16.     Defendant represented that the DePuy ATTUNE System "builds on the LCS Complete Knee System and the Sigma Rotating platform Knee."

17.     Defendant sought FDA clearance for the ATTUNE system through the "510(k)" process.

18.     Section 510(k) of the Food, Drug and Cosmetic Act ("FDA") provides a mechanism for device manufacturers to obtain accelerated FDA clearance for products that are shown to be "substantially equivalent" to a product that has previously received FDA approval.  The process requires device manufacturers to notify the FDA of their intent to market a medical device at least 90 days in advance of introduction to the market.  This is known as Premarket Notification – also called PMN or 510(k).  This approval process allows the FDA to determine whether the device is substantially equivalent to a device already approved for marketing.

19.     In December 2010, Defendant received FDA clearance of the ATTUNE System under the "510(k)" approval process.  The basis for FDA clearance was the substantial similarity of the ATTUNE system to several prior devices, including the Defendant's SIGMA Knee System.

20.     Defendant received FDA 510(k) approval of the components of the ATTUNE system in 2010 and 2011, following only limited testing of the new ATTUNE system.

21.     The ATTUNE system includes the Attune Tibial Base (510KI Number K101433), also called the tibial tray, which, as compared to the SIGMA system, included a design change to the keel, the surface texture and/or finish of the tibial baseplate and "combined with new technology to treat the underside of the implant," among other changes.

22.     Defendant introduced its ATTUNE system, including procedures for implantation, to surgeons and consumers in or about March of 2013.  On March 20, 2013, Defendant issued a press release announcing the "latest innovation in total knee replacement—the ATTUNE Knee

System—at the 2013 American Academy of Orthopedic Surgeons (AAOS) annual meeting in Chicago."

23.     According to the March 20, 2013, release, the ATTUNE system was "designed to provide better range of motion and address the unstable feeling some patients experience during everyday activities, such as stair descent and bending."  Its "proprietary technologies include: … SOFCAMTM Contact: An S-curve design that provides a smooth engagement for stability through flexion, while reducing stresses placed on the implant."

24.     Defendant claimed the ATTUNE system contained "new" technologies and that the ATTUNE system was one of the largest research and development projects in the history of the DePuy Synthes Companies, costing approximately $200 million.  Defendant described the following features of the ATTUNE system: "the largest clinical program at DePuy," "improves value of TKA," "compares favorably in joint registries," and is "significantly less symptomatic crepitus, primarily Sigma PS."

25.     DePuy represented to the public the ATTUNE system featured a gradually reducing femoral radius, an innovative s-curve design of the posteriorly stabilized cam, a tibial base which can be downsized or upsized two sizes versus the insert, novel patella tracking, lighter innovative instruments, and a new polyethylene formulation.

26.     According to Defendant, the ATTUNE system conferred greater mid flexion stability as the implanted knee moves from extension to flexion because of the more gradual change in the femoral component radius of curvature.  The ATTUNE design was described as offering greater functional benefits and a greater angle of movement as compared to other implants.

27.    DePuy represented to the public the new ATTUNE system improved functional outcomes, provided stability, improved patient satisfaction, and improved operating room efficiency.

28.    The ATTUNE system did not and has not delivered on these commitments.  Instead, the ATTUNE system has resulted in significantly higher failure rates than previous knee replacements due to products debonding of the tibial baseplate.  Thousands of knee replacement patients, including Plaintiff, implanted with ATTUNE systems have had more expensive, more dangerous, and less effective total knee replacement surgeries, and many have required or will require expensive and dangerous knee revision surgery to remove and replace the defective ATTUNE system.

29.    Soon after the ATTUNE system was introduced, in 2013 and 2014, Defendant became aware of ATTUNE safety issues and failures.  These included reports made to and collected by the FDA in its Manufacturer and User Facility Device Experience ("MAUDE") database, which includes reports on medical devices submitted by manufacturers, importers and device user facilities to the FDA.  Reports made to MAUDE described failures resulting from ATTUNE design failures causing loosening and/or debonding at the interface between the tibial baseplate and bone where the cement/implant is located.  The MAUDE reports describe a high incidence of aseptic loosening at the tibial baseplate, creating the need for an additional revision surgery for patients who have received the ATTUNE knee replacement.

30.    Since the ATTUNE system was introduced, Defendant has expanded the ATTUNE system product line and has claimed that it would provide a more life-like knee to patients who were "expecting to maintain an active lifestyle."  Defendant has successfully marketed the

ATTUNE system and has become the dominant player in the knee market, upon information and belief, selling hundreds of thousands of ATTUNE systems worldwide.

31.     Three years after the ATTUNE system was approved and introduced on March 10, 2016, Defendant submitted a Section 510(k) premarket notice of intent to market the ATTUNE Revised system.  The revised system included a new stem, which added length and a keel for additional stability and recessed cement pockets intended to promote cement fixation.  The stem of the ATTUNE Revised system was designed with a cylindrical or tapered body geometry with a blasted and fluted fixation surface.

32.     Defendant required FDA approval of the new tibial baseplate by application dated March 17, 2017, which had been "prepared" on March 16, 2016.  The application requested clearance of a new tibial baseplate component as part of the Attune system, which was called the "Attune S+ Technology" ("ATTUNE S+") by Defendant.  In particular, the application identified the design changes in the tibial base with the ATTUNE S+, including a newly designed "keel to provide additional stability," "recessed undercut cement pockets," and a "grit blasted surface for enhanced cement fixation" or microblast finish.

33.     The "Summary of Technologies" portion of the 510(k) application for the ATTUNE S+ tibial baseplate includes the following: The ATTUNE Cemented Tibial Base, FB provides a macro geometric feature and an optimized micro-blast finish which are both intended to aid in fixation of the tibial implant to the bone cement.  The ATTUNE Cemented Tibial Base, FB is designed to enhance fixation by improving resistance (relative to the industry) to intra-operative factors which can result in a reduction in cement to implant bond.

34.     According to DePuy, the ATTUNE S+ tibial baseplate also features macro geometry and 45-degree undercut pockets designed to provide a macro-lock between the cement-

implant interface.   According to Defendant, the "ATTUNE S+ Technology finishing process increases the surface roughness compared with other, DePuy Synthes clinically proven, tibial tray designs that were tested."  *See* Depuy Synthes PowerPoint, "ATTUNE S+ Technology."

35.    Accordingly, by March 16, 2016, DePuy had recognized deficiencies in its design of the original ATTUNE system tibial baseplate, had identified the deficiencies and/or mechanisms of failure associated with it, had researched and designed the modifications to the new tibial tray/baseplate in the ATTUNE S+ system, and had conducted testing of the new tibial baseplate, as detailed in its application submitted to the FDA.

36.    DePuy revised the tibial base to improve cement attachment.   The revisions included additional and deeper pockets on the back side of the tibial base and optimized surface conditions on the tibial base.

37.    Beginning in December 2016, Defendant began stating, in its responses in MAUDE failure reports, that the ATTUNE system was being improved in the manner set out in the proposed 510(k) application.

38.    In response to 2016 MAUDE reports, Defendant reported it had "undertaken to investigate further" complaints of aseptic loosening in the ATTUNE system.  DePuy stated: "The analysis and investigations eventually led to a new product development project, which will enhance fixation and make the product more robust to surgical technique."  The ATTUNE S+ system was the new product referenced by DePuy.

39.    In response to MAUDE failure reports concerning the ATTUNE system, DePuy stated that: "investigation closed at this time.  Should the additional information be received, the information will be reviewed and the investigation will be reopened as necessary."

40.     On June 15, 2017, the FDA approved DePuy's 510(k) clearance on the new ATTUNE S+ technology.

41.     Between preparing the 510(k) application on March 16, 2016 and the FDA approval on June 15, 2017 of the ATTUNE S+ system, DePuy continued to market and sell the ATTUNE system without the modifications included in the ATTUNE S+ system.

42.     Before August 2016, DePuy knew the improved design of the tibial base contained in the ATTUNE S+ system provided improved performance of the ATTUNE total knee replacement system.

43.     Before August 2016, DePUy knew the improved design of the tibial base contained in the ATTUNE S+ system reduced the risk of aseptic loosening at the interface of the cement and the tibial base.

44.     Before August 2016, DePuy knew the improved design of the tibial base contained in the ATTUNE S+ system would reduce the risk of a second knee revision surgery.

45.     Defendant's strategic decision to design and obtain FDA 510(k) approval of the new and improved ATTUNE S+ tibial baseplate is an admission, or compelling evidence, the original ATTUNE tibial baseplate is defective and has significant deficiencies.

46.     Defendant did not recall the tibial baseplate in the ATTUNE system or inform consumers and surgeons about the dangers of its use.

47.     Defendant knew about the deficiencies in the design of the original ATTUNE system tibial baseplate before the newly designed tibial baseplate (ATTUNE S+) was cleared in June 2017, yet DePuy failed to share this information with patients scheduled to have surgery to have the ATTUNE system implanted in their knee or share it with their surgeons.

48.    DePuy continued to market and sell the ATTUNE system without the modifications contained in the ATTUNE S+ system without providing notice to consumers, doctors, or patients that the original ATTUNE knee system had been defectively designed.

49.    Although Defendant knew about the high number of ATTUNE system failures resulting in revision surgeries before Plaintiff's implant surgery in 2017, Defendant failed to warn surgeons, consumers and patients, and allowed the original, defective design to continue to be implanted by unsuspecting surgeons into unsuspecting patients including the Plaintiff.

50.    On March 15, 2017, DePuy Synthes, at the American Academy of Orthopaedic Surgeons ("AAOS") Annual Meeting in San Diego, California, announced the launch of the first ATTUNE Revision Knee System ("ATTUNE Revised system" or "ATTUNE S+ system"), which included the Attune Revision Fixed Bearing Tibial Base and a 14 x 50 mm Cemented Stem.

## FAILURES OF THE ATTUNE SYSTEM

51.    The ATTUNE system, prior to the 2016 redesign primarily fails due to mechanical loosening, which sometimes is referred to as "aseptic loosening."

52.    Mechanical loosening is caused by a failure of the bond between the tibial base and the implant cement.

53.    By August 2016, DePuy recognized that aseptic loosening was the most frequent cause of revision surgery for the remainder of the implant life.

54.    By August 2016, DePuy recognized when the cement fails to bond to the tibial base it can result in mechanical loosening eventually leading to revision surgery.

55.    By August 2016, DePuy had received reports that when the ATTUNE system tibial base was extracted during a revision surgery it was observed and reported that there was no attachment or bonding between the tibial base and the cement.

56.    By 2016, DePuy recognized mechanical loosening had occurred at an unprecedented rate in patients implanted with the ATTUNE system.

57.    Mechanical loosening of the tibial base can be visualized and diagnosed through radiographic imaging, through which the loosening between the cement and the tibial base is evidenced by one or more radiolucent lines around the contours of the tibial base where loosening is occurring.

58.    By August 2016, DePuy knew mechanical loosening in an artificial knee generally causes pain, discomfort and, ultimately, the impairment in knee function.

59.    By August 2016, DePuy knew that when a patient loses knee function it usually and seriously restricts a patient's daily activities.

60.    By August 2016, Depuy knew that once there is mechanical loosening of the tibial base, the patient may require a second revision surgery to remove the knee implant and replace it with a new one.

61.    By August 2016, DePuy knew that failed total knee prosthesis often causes severe bone loss.

62.    By August 2016, DePuy knew revision surgeries are often complicated and the patient has a greater period of recovery.

63.    By August 2016, DePuy knew the success rate of a revision surgery is much lower than that of the initial total knee replacement and that the risks and complications are higher and include increased pain and limitations in range of motion.

64.    Beginning in 2013, Defendant became aware of issues with aseptic loosening in the components of the ATTUNE system.   These concerns were evidenced through failure reports

submitted to and kept in the FDA's MAUDE database, which houses medical device reports submitted to the FDA by reporters such as manufacturers, importers, and device user facilities.

65.     By August 2016, DePuy knew ATTUNE system design elements caused loosening and/or de-bonding at the tibial baseplate cement/implant interface.

66.     MAUDE reports detailed a high incidence of aseptic loosening at the tibial baseplate of the ATTUNE system resulting in subsequent revision surgeries.

67.     The FDA MAUDE database includes thousands of reported failures of the ATTUNE system and hundreds of reported revision surgeries associated with those reported failures.

68.     In January 2017, the *Journal of Arthroplasty* published a study by Dr. Raymond H. Kim and other Colorado Joint Replacement surgeons in the Department of Orthopedic Surgery, and North Carolina, Department of Orthopedic Surgery surgeons titled *Tibial Tray Thicknesses Significantly Increases Medial Tibial Bone Resorption in Cobalt-Chronium Total Knee Arthroplasty Implants*, which reported that the thicker cobalt-chronium base plate of the ATTUNE system was associated with significant tibial bone loss.

69.     At the AAOS Annual Meeting in March 2017, Assistant Professor of Orthopaedic Surgery at the University of Cincinnati College of Medicine, Dr. Todd Kelley, presented a poster: "High Incidence of Stress Shielding and Radiolucent Lines with a Novel Total Knee System," which was based on a study of the ATTUNE system.  The study looked at 164 patients who received an ATTUNE total knee replacement between February 2013 and February 2015.  The study identified a high incidence of stress of "tibial AP zone 1," which is the medial breastplate.

70.     In 2017, the alarming rate of failures associated with the ATTUNE system due to debonding of the tibial baseplate also was the subject of a paper by Dr. Peter M. Bonutti and

colleagues: "Unusually High Rate of Early Failure of Tibial Component in ATTUNE Total Knee Arthroplasty System at Implant-Cement Interface" (the "Bonutti Article"). The Bonutti Article presented persuasive evidence that the design and/or composition of the ATTUNE system, and particularly the tibial baseplate component, contributed significantly to de-bonding at the interface between the cement and the tibial baseplate, with associated high rates of failure and the need for revision surgery.

71.    The intraoperative findings in the Bonutti Article identified freely mobile tibial baseplates with loosening occurring at the implant-cement interface.  For all tibial baseplate failures in the study, the tibial component had de-bonded and was separated easily from the cement mantle, even though the cement itself remained strongly adherent to the tibial bone.  On the femoral side, however, the cement was strongly adherent to the implant surface in all cases.  The mean time to revision for ATTUNE systems involved in the study was only 19 months.

72.    The Bonutti Article concluded that high ATTUNE system failure rates were due to de-bonding at the tibial-cement interface caused by a combination of factors, including the increased constraint of the ATTUNE's tibial polyethylene component; rounded edges and reduced cement pockets necessary for cement inter-digitation in the tibia (as compared to the DePuy SIGMA); reduced keel rotation flanges and/or stabilizers on the keel; and insufficient surface roughness of the tibial baseplate component.

## **DEFENDANT'S MARKETING OF ATTUNE SYSTEMS**

73.    According to DePuy, the ATTUNE system produces better stability of the knee in deep flexion, reduces the joint forces, and produces better patella tracking, operative flexibility and efficiency, and implant longevity.  DePuy included these assertions in marketing the ATTUNE system.  Despite these claims, a significant number of revision cases resulting from the defects in the ATTUNE tibial baseplate appeared soon after patients received the ATTUNE system.

74.    Defendant represented those patients receiving the ATTUNE system had significantly greater range of motion than patients receiving other knee replacements, and also represented further that the ATTUNE system helps the patient maintain stability during activities such as walking and going up and down stairs.

75.    Defendant promised patients that in receiving an ATTUNE system they could recover faster and engage in more active lifestyles.

76.    These representations were untrue; the ATTUNE system is prone to failure and causes patients to experience additional pain and injury.

77.    Defendant designed, manufactured, tested, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part of the sale and distribution of medical devices, and by these activities, caused the ATTUNE systems to be placed into the stream of commerce throughout the United States, including Minnesota.

78.    Defendant actively and aggressively marketed to doctors and the public that the ATTUNE systems were safe and effective total knee prostheses.

79.    From the time that Defendant first began selling the ATTUNE systems, the product labeling and product information for the ATTUNE system failed to contain adequate information, instructions, and warnings concerning the increased risk that the ATTUNE system fails at an extremely high rate.

80.    Despite Defendant' knowledge of the serious injuries associated with the use of the ATTUNE system, Defendant continues to engage in marketing and advertising programs which falsely and deceptively creates the perception that the ATTUNE system is safe.

81.    Upon information and belief, Defendant downplayed the health risks associated with the ATTUNE system through promotional literature and communications with orthopedic

surgeons.  Defendant deceived doctors, including Plaintiff's surgeon, and potential users of the ATTUNE system by relaying positive information, while concealing the nature and extent of the known adverse and serious health effects of the ATTUNE system.

82.     Based on the design changes made to the original Attune tibial baseplate before it was put on the market, and the number of failures reported since it was launched, Defendant, through their pre-marketing and post-marketing analysis, knew or should have known that the ATTUNE system was prone to fail.  Plaintiff knew or should have known the ATTUNE system is defective and unreasonably dangerous.

## CASE SPECIFIC FACTUAL ALLEGATIONS

83.     Plaintiff Quast is an attorney in active practice of law.  He was born on April 7, 1954.

84.     In 2016 and 2017, having experienced significant and increasing knee discomfort, Mr. Quast was examined at Summit Orthopedics, which recommended a total knee arthroplasty. Mr. Quast agreed to undergo knee replacement surgery.

85.     On May 17, 2017, Dr. Leo Daly implanted an ATTUNE Knee System in Quast's left knee as part of a total knee arthroplasty.

86.     Plaintiff was a proper candidate for the total knee joint replacement.

87.     Dr. Daly implanted ATTUNE system components using femur size 7 posterior stabilized, patella component 38mm, tibia size 6, 10mm polyethylene insert into Plaintiff's left knee.

88.     Dr. Daly implanted the Attune tibial base using DePuy CMW 2 Bone Cement, REF # 3322-020, LOT # 8280491 into Mr. Quast's left knee.

89.     Dr. Daly properly followed the DePuy instructions, training, and procedures when he implanted the ATTUNE system into Mr. Quast's left knee.

90.     Dr. Daly properly followed the instructions, training, and procedures when he applied the DePuy CMW2 Bone Cement into the tibia of Mr. Quast's left knee.

91.     A representative of DePuy attended the surgery and observed the implantation of the ATTUNE system into Mr. Quast's left knee.  The DePuy representative approved Dr. Daly's surgical procedure when he implanted the ATTUNE system.

92.     There was nothing in the surgical procedure used by Dr. Daly that caused or contributed to the subsequent failure of the ATTUNE system he implanted in Mr. Quast's left knee.

93.     Neither Quast nor his physicians, including Dr. Daly, were aware, by warning or otherwise, of the defects in the ATTUNE system, and would not have used the ATTUNE system had they been aware of the defective nature of the device.

94.     DePuy did not inform Mr. Quast that DePuy had revised the ATTUNE system and that DePuy was awaiting approval from the FDC for the revised features in the Tibial base in the ATTUNE system.

95.     DePuy knew for at least nine months that the ATTUNE system was in fact prone to premature failure and dislocation and to cause patients to experience great pain and instability. In addition, the glue used to adhere the parts was known to fail, cause patients to feel a slipping sensation and instability.

96.     Within two and a half years after the ATTUNE system was implanted, Mr. Quast was experiencing severe and persistent pain, discomfort, swelling, instability, and difficulty ambulating.

97.     In 2020, Mr. Quast returned to Dr. Daly, after experiencing constant pain with swelling in the replaced left knee, and difficulty ambulating.  Mr. Quast experienced pain twenty-four hours a day and seven days a week, and his range of motion was limited.

98.     Mr. Quast was advised by Dr. Daly that he had received a DePuy ATTUNE system knee replacement in the 2017 TKD surgery, which lacked the modifications and improvements made in the new ATTUNE S+ technology eventually approved by the FDA in June of 2017.

99.     Mr. Quast was further advised that the ATTUNE system he received was beset with deficiencies lending to a high failure rate, and that physicians and associated practices, including Summit and Dr. Daly, had not been apprised of the deficiencies or the impending modification being undertaken by DePuy.

100.     Mr. Quast then consulted with the M Health Fairview Orthopedic Clinic Minneapolis and Dr. Paul Hoogervorst, M.D. about possible additional revision surgery to replace the ATTUNE system Plaintiff had received in 2017.

101.     Based on his review of Plaintiff's medical file history and his examination of Mr. Quast, Dr. Hoogervorst agreed an additional revision surgery was appropriate.

102.     Mr. Quast received a total arthroplasty revision surgery on his left knee on December 16, 2021.  The surgery was performed by Dr. Hoogervorst and Dr. Sean Caskey.

103.     "Operative findings" during the surgery included that "[t]he tibial component (of the ATTUNE replacement implanted in 2017) was grossly loose with no cement implant interface."

104.     "Operative Procedure" descriptions of the December 16, 2021, surgery on Mr. Quast record that "[a]fter the femoral component was successfully removed from the knee, the

knee was brought into extension and the tibial component was inspected.  It was found to be grossly loose and freely mobile without any attempt to free up the bone cement implant interface."

105.    Dr. Hoogervorst's observations during the revision surgery are substantially similar to the finding of other surgeons during revision surgeries to replace ATTUNE system artificial knees.

106.    Prior to August 2016, Surgeons had reported to DePuy that during revision surgeries they observed the tibial base coming from the tibia with little or no force.  They observed the cement did not bond or adhere to the tibial base.  They also observed when the tibial base was removed from patient's tibia, the tibial base left an impression in the cement mantle in the shape of the keel of the tibial base.

107.    Prior to August 2016, DePuy was aware that other surgeons during revision surgeries had reached the conclusion the failure of the cement bonding to the tibial base caused aseptic or mechanical loosening in the ATTUNE system.

108.    The failure of the ATTUNE system was the sole cause of Plaintiff's knee revision surgery.  But for the failure of the ATTUNE system, Mr. Quast would not have required the knee revision surgery.

109.    As a direct and proximate result of Defendant placing the ATTUNE system in the stream of commerce, Mr. Quast has suffered and continues to suffer both injuries and damages, including, but not limited to: past, present, and future physical and mental pain and suffering; and past, present, and future medical, hospital, rehabilitative, monitoring, and pharmaceutical expenses, economic damages, disability, severe and possibly permanent injuries, and other related damages.

110.     All the injuries and complications suffered by Plaintiff were caused by the defective design, warnings, construction, and unreasonably dangerous character of the ATTUNE system that was implanted in him.  Had Defendant not concealed the known defects, the early failure rate, the known complications, and the unreasonable risks associated with the use of the ATTUNE system, Mr. Quast would not have consented to the ATTUNE system being used in his total knee arthroplasty.

111.     The ATTUNE system was used for the purpose for which it was designed, intended, and marketed and, at the time it failed and injured Mr. Quast, was not materially changed in any way from the condition it was in when sold by the Defendant.

## COUNT ONE
### (Strict Liability)

112.     Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

113.     Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

114.     Defendant designed, manufactured, promoted, distributed, marketed, and sold the ATTUNE system that was implanted in Plaintiff's left knee.

115.     At all times relevant, Defendant was in the business of selling ATTUNE system for use by and upon consumers.

116.     At all times relevant, the ATTUNE system that Plaintiff received was in a defective and unreasonably dangerous condition.  Such condition included, but is not limited to, one or more of the following particulars:

    a.  The ATTUNE system that Plaintiff received contained design defects including, but not limited to, mechanical loosening and failures due to de-bonding at the tibial-cement interface: including the increased constraint of the

ATTUNE's tibial polyethylene component; rounded edges and reduced cement pockets necessary for cement inter-digitation in the tibia; reduced keel rotational flanges and/or stabilizers on the keel; and insufficient surface roughness of the tibial baseplate component.

b.  The ATTUNE system design of the implant subjected Plaintiff and others to risks, including the risk that Plaintiff would develop inflammation, swelling, and bone loss, as a result of the implant, causing the implant to prematurely fail, and requiring Plaintiff to undergo a complex, risky, and painful surgery to remove and replace the defective implant.

c.  Safer alternative designs existed, including the design of the ATTUNE S+ system and the design of the device used during Plaintiff's revision surgery.

d.  The likelihood of the ATTUNE system causing injuries of the sort Plaintiff sustained was high given the significant number of persons who experienced loosening and ultimate failure of the implant.

e.  Neither the ultimate consumer – Plaintiff, in this case – nor his health care providers had the ability to avoid via exercise of reasonable care the consequences that befell Mr. Quast in this case because they did not know and had no reason to know of the defects in the implant.

f.  As detailed further below, the ATTUNE system lacked any warnings or instructions that might have ameliorated the risks that resulted in Plaintiff's injuries and revision surgery.

g.  The ATTUNE system that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff's health care providers,

including Dr. Daley, of the full nature or extent of the risks associated with its use. The ATTUNE system was not accompanied by a warning which specifically and fully informed Plaintiff's health care providers, of the risks of mechanical failure and de-bonding associated with the implant.

117. Defendant knew or should have known of the dangers associated with the use of the ATTUNE system as well as the defective nature of the ATTUNE system. Such knowledge is evidenced by facts including, but not limited to:

a. Defendant submitted a 510(k) application to the FDA to revise the ATTUNE system that improved the tibial base component.

b. Defendant performed extensive review of the revisions to the tibial base component of the ATTUNE system and knew the tibial base component would be improved by the proposed revisions to the tibial base component contained in the 2017 510(k) application.

c. The proposed revisions to the tibial base component served to improve the stability of the tibial base component and reduce the risk of aseptic debonding between the cement mantle and the tibial component.

d. Medical literature documenting a causal link between the ATTUNE system and inflammation, swelling, bone loss, and de-bonding.

e. Prior lawsuits against Defendant alleging that the ATTUNE system (or other similar implants) caused patients to suffer mechanical failure, inflammation, swelling, bond loss, and de-bonding.

118. The ATTUNE system was as above-described, defective and unreasonably dangerous condition at the time Defendant placed in the stream of commerce.

119.    The ATTUNE system was expected to reach, and did reach, prescribing physicians and consumers, including Plaintiff, without substantial change in the condition in which they were sold.

120.    At all times relevant, Plaintiff was a person in need of an artificial knee implant and thus a person Defendant should reasonably have expected to receive the ATTUNE system.

121.    Plaintiff and his medical providers used the ATTUNE system as directed, and for their intended purposes.

122.    At all times relevant, the ATTUNE system was defective, and Defendant knew that they were to be used by consumers without inspection for defects therein.  Moreover, neither Plaintiff nor his health care providers knew or had reason to know at the time of the use of the subject products, of the existence of the aforementioned defects.  Neither Plaintiff nor his physician could have discovered the defects in the ATTUNE system through the exercise of reasonable care.

123.    The ATTUNE system was not materially altered or modified prior to its use in Plaintiff.

124.    Defendant's acts were a cause of the injuries, damages, and losses of the Plaintiff.

125.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

**COUNT TWO**
**(Negligence)**

126.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

127.    Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

128.    Defendant designed, manufactured, promoted, distributed, marketed, and sold the ATTUNE system that injured Plaintiff.

129.    At all times relevant, Plaintiff was a person in need of an artificial knee implant and thus a person Defendant should reasonably have expected to receive the ATTUNE system.

130.    At all times relevant, Defendant negligently failed to exercise reasonable care to prevent the ATTUNE system from creating an unreasonable risk of harm to persons, including Plaintiff, who were using the device in a manner and for a purpose for which it was made.  Such negligence included, but is not limited to the following:

  a.  Designing, manufacturing, promoting, distributing, marketing, and selling the ATTUNE system prosthetic knee implant despite knowledge the prosthetic knee implants pose a risk of mechanical failure, inflammation, swelling, bone loss, and de-bonding;

  b.  Failing to ensure that the ATTUNE system was accompanied by specific warnings and/or instructions sufficient to fully inform consumers, including Plaintiff, of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding associated with the implant;

  c.  Failing to ensure that the ATTUNE system was accompanied by specific warnings and/or instructions sufficient to fully inform physicians, health care providers, and other consumers of the risk that they might have an adverse reaction to the implant; and

  d.  Failing to conduct adequate testing to determine whether the ATTUNE system, with its design and construction, would mechanically fail or de-bond in a significant number of recipients.

131.    The Defendant's acts were a cause of the injuries, damages, and losses of the Plaintiff.

132.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

## COUNT THREE
### (Breach of Implied Warranties)

133.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

134.    Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

135.    Prior to the time that the ATTUNE system was used by Plaintiff's surgeon and healthcare providers, Defendant impliedly warranted to Plaintiff that the ATTUNE system was of merchantable quality and safe and fit for the use for which it was intended.

136.    Plaintiff's surgeon and healthcare providers did not research, design, or manufacture medical devices such as the ATTUNE system.  Plaintiff's surgeon and healthcare providers reasonably relied on the skill, judgment, and implied warranties of Defendant in deciding to use the ATTUNE system on their patients, including Mr. Quast.

137.    The ATTUNE system was neither safe for its intended use nor of merchantable quality, as warranted by Defendant, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.  Specifically:

    a.    The mechanical failure of the ATTUNE system subjected Plaintiff and others to risks, including the risk that Plaintiff would develop inflammation, swelling, bone loss, and de-bonding as a result of the implant, causing the implant to prematurely fail, and requiring Plaintiff to undergo a complex, risky, and painful surgery to remove and replace the defective implant; and

    b.    The ATTUNE system that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risks associated with its use.  The ATTUNE system was not accompanied

by a warning which specifically and fully informed Plaintiff of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding associated with the implant.

138.    Defendant, by selling, delivering, and/or distributing the defective ATTUNE system to Plaintiff, breached the implied warranty of merchantability and warranty of fitness and caused Plaintiff to suffer severe pain and emotional distress, incur medical expenses, and incur a loss of earning capacity.

139.    The acts of the Defendant were a direct and proximate cause of Plaintiff's injuries, damages, and losses.

140.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

## COUNT FOUR
### (Breach of Express Warranty)

141.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

142.    Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

143.    At all times relevant, Defendant expressly warranted to Plaintiff's physicians, surgeons, and other healthcare providers, by and through statements made by Defendant or their authorized agents or sales representatives, orally and in publications, package inserts, and other written materials intended for physicians, medical patients, and the general public, that the ATTUNE system was safe, effective, fit, and proper for its intended use.

144.    Plaintiff's physicians, surgeons, and healthcare providers are not involved in the research, design, and/or manufacture of medical devices such as the ATTUNE system. Plaintiff's physicians, surgeons, and healthcare providers reasonably relied entirely on the skill, judgment, representations, and foregoing express warranties of Defendant in using the ATTUNE system.

145.    Said representations and warranties were false in that the ATTUNE system was not safe, effective, fit, and proper for its intended use in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.  Specifically:

a.    The design of the ATTUNE system subjected Plaintiff and others to risks, including the risk of mechanical failure, that Plaintiff would develop inflammation, swelling, bone loss, and de-bonding as a result of the implant, causing the implant to prematurely fail, and requiring Plaintiff to undergo a complex risky, and painful surgery to remove and replace the defective implant;

b.    The ATTUNE system that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risk associated with its use; and

c.    The ATTUNE system was not accompanied by a warning which specifically and fully informed Plaintiff of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding.

146.    The Defendant's acts were a direct and proximate cause of the injuries, damages, and losses of the Plaintiff.

147.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

**<u>COUNT FIVE</u>**
**(Failure to Warn Food and Drug Administration)**

148.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

149.    Having become aware that the ATTUNE system experienced a high failure rate, was defective, and needed significant redesign and manufacture to address a high incidence of

tibial debonding and related problems, Defendant was obligated to warn the Food and Drug Administration of the same.

150.    Defendant failed in its duty to warn the Food and Drug Administration.

151.    Plaintiff was thereby injured.

152.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

## COUNT SIX
### (Failure to Warn Physicians and Their Patients)

153.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

154.    Having become aware that the ATTUNE system experienced a high failure rate and needed redesign, Defendant had a duty to warn physicians and patients in need of TKR surgery, including Plaintiff and Plaintiff's physicians and surgeons of the same.

155.    Defendant failed to meet its duty to warn, and instead allowing the original ATTUNE systems to remain in the marketplace and be used in TKR surgeries, including that received by Plaintiff.

156.    Had Defendant met its duty to warn, Plaintiff would not have elected to receive the ATTUNE system TKR surgery.

157.    Plaintiff was thereby injured, and the acts and omissions of the Defendant were a direct and proximate cause of Plaintiff's injuries, damages, and losses.

158.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

## COUNT SEVEN
### (Negligent Misrepresentation)

159.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

160.    Defendant falsely and without reasonable basis, and contrary to documented patient experiences, represented that its ATTUNE system was safe and effective and superior to comparable products in the market.

161.    The representations were made for the purpose of inducing individuals in need of TKR surgery, including Plaintiff, of choosing or accepting surgery to receive the ATTUNE system TKR surgery.

162.    Plaintiff reasonably relied on the representations in agreeing to receive an ATTUNE system TKR surgery.

163.    As a result of Defendant's negligent misrepresentations, Plaintiff has been injured and damaged.

164.    Plaintiff is entitled to damages in an amount exceeding $75,000 to be proven at trial.

## COUNT EIGHT
### (Fraud / Intentional Misrepresentation)

165.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs herein.

166.    Defendant represented the ATTUNE system to be safe and effective and superior to comparable products.

167.    At the time it made the representations, Defendant knew them to be untrue, or made the representations with reckless indifference to their truth or falsity.

168.    Persons in need of TKR surgery, including Plaintiff, and the physicians and surgeons treating such persons, including Plaintiff's physicians and surgeons, reasonably relied on Defendant's representations.

169.    Knowing the ATTUNE system to be defective, unsafe, and in need of redesign, Defendant concealed its knowledge of the product's defect, and allowed defective ATTUNE systems and parts to be sold and implanted.

170.    Had Defendant been truthful and not concealed the defects in the ATTUNE system, Plaintiff would not have elected to receive Defendant's product.

171.    Plaintiff has been damaged in an amount exceeding $75,000 to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in favor of Plaintiff and against Defendant in an amount that will compensate Plaintiff for all injuries, damages, and losses. Plaintiff prays for interest, both statutory and moratory, from the date of injury before and after judgment.  Plaintiff prays for an award of costs, expert witness fees, reasonable attorney fees, and all other appropriate relief.  Plaintiff reserves the right to amend this Complaint to add a claim for punitive damages at the appropriate time.  Plaintiff prays for any further legal and equitable relief that the Court deems just and proper.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES,
INCLUDING ALL CLAIMS AND CROSS-CLAIMS.

Respectfully submitted,

**DEWITT LLP**

Dated:  February 2, 2022

By  */s/Dwight G. Rabuse*

Dwight G. Rabuse (#209429)
Zachary P. Armstrong (#399992)
2100 AT&T Tower
901 Marquette Avenue S.
Minneapolis, MN  55402
Telephone:  (612) 305-1402
dwight@dewittllp.com
zpa@dewittllp.com

**ATTORNEYS FOR PLAINTIFF**